# *United States District Court*

_____ **MIDDLE** _____ **DISTRICT OF** _____ **ALABAMA** _____

| | |
|---|---|
| **In the matter of the Search of** | APPLICATION AND AFFIDAVIT |
| (Name, address or brief description of person, property or premises to be searched) | FOR SEARCH WARRANT |

CASE NUMBER: 2:06mj133-DRB

8121 Mossy Oak, Montgomery, Alabama 36117

I _____ Margaret Faulkner _____ being duly sworn depose and say:

I am a(n) ___ Special Agent, Federal Bureau of Investigation ___ and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

8121 Mossy Oak, Montgomery, Alabama 36117

in the _____ Middle _____ District of _____ Alabama _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

### SEE ATTACHMENT B

which is (state one or more bases for search set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

**property that constitutes evidence of the commission of a criminal offense,**

concerning a violation of Title 18, United States Code, Section 2252A.

The facts to support the issuance of a Search Warrant are as follows:

### See Attached Affidavit

Continued on the attached sheet and made a part hereof:  ☒ Yes   ☐ No

_Margaret L. Faulkner_
Signature of Affiant

Sworn to before me and subscribed in my presence,

November 17, 2006 _____ at _____ Montgomery, Alabama _____
Date                                                                           City and State

DELORES R. BOYD, U.S. Magistrate Judge _____
Name & Title of Judicial Officer                                        Signature of Judicial Officer

AFFIDAVIT

Your affiant, Margaret Faulkner, having first been duly sworn, does state that the following information is true and correct to the best of his knowledge:

1.    I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for the past 18 ½ years. Prior to my employment with the FBI, I was employed with the Montgomery Police Department (MPD) for 10 ½ years. While employed with MPD, I investigated child sex crimes for 5 years. Presently, I am the Crimes Against Children Coordinator for the Middle District of Alabama and have attended numerous FBI schools dealing with child sex crimes, to include schools offering courses for investigators on child pornography on the internet.

2.    This affidavit is being made in support of a search warrant for the residence of 8121 Mossy Oak Drive, Montgomery, Alabama, 36117, the residence of Ronald A. Nelson. The information obtained in this affidavit is based on my experience as well as information provided by other law enforcement to include agents of the FBI, Atlanta Division.

3.    This investigation arose from an under cover investigation conducted by the FBI. Because this affidavit is being submitted for the limited purpose of securing a search warrant, it does not include each and every known fact concerning this investigation; rather, only the facts believed necessary to establish probable cause for the requested search warrant. However, even though not every fact has been included, I do not believe anything has been omitted which would vitiate the probable cause set forth herein.

4.    I have probable cause to believe that evidence of a violation of Title 18 USC 2422(b) (Enticing a Minor to Engage in Sexual Activity),Title 18 USC 2252 (Certain Activities Relating to Material Involving the Sexual Exploitation of Minors), and 2252A(Certain Activities Relating to Material Constituting or Containing Child Pornography), including but not limited to, instrumentalities of such violation(s) and any fruits of the crime can be located at 8121 Mossy Oak Drive, Montgomery, Alabama, 36117.

## DEFINITIONS PERTINENT TO THIS INVESTIGATION

5.    CHILD PORNOGRAPHY:  as used in this affidavit, includes the definition in Title 18 USC 2256 as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct as defined in Title 18, USC 2252.

6.    CHILD EROTICA:  any material, relating to children, that is sexually arousing to a given individual, but that is not, in and of itself, obscene or illegal. Some of the

more common types of child erotica include drawings, fantasy writings, diaries, and pictures of children that are not sexually explicit.

7.    COMPUTER: defined, pursuant to Title 18, USC 1030(e)(1), as an electronic magnetic, optical, electrochemical or other high speed data processing devise performing logical or storage functions and includes any data storage facility or communication facility directly related to, or operating in conjunction with such devices.

8.    INTERNET: a collection of computers and computer networks which are connected to one another via high speed data links and telephone lines for the purpose of sharing information. Connections between internet computers exist across state and international borders and information sent between computers connected to the internet may cross state and international borders, even if those computers are located in the same state.

9.    INTERNET SERVICE PROVIDER (ISP): a commercial service that provides internet connections for its subscribers. In addition to providing access to the internet via telephone or other telecommunication lines, ISPs may also provide internet email accounts and other services unique to each particular ISP.

10.   ADDRESSES: computers connected to the internet are identified by addresses. Internet addresses are unique and can be resoled to identify a physical location and specific computer connection. Internet addresses take on several forms, including Internet Protocol addresses, Uniform Resources Locator (URL) addresses and domain addresses. A domain address of "mymachine@mydomain.com" defines a computer called "mymachine" with the "mydomain.com" internet domain.

11.    INTERNET PROTOCOL ADDRESS (IP): a unique numeric address used by computers on the internet. An IP address is a series of four numbers separated by periods (eg., 123.45.67.890). Every computer attached to the internet must be assigned a unique IP address so that internet traffic sent from and directed to that computer may be directed properly from it's source to it's destination.

12.   MODEMS: permit a connection to the internet over the same lines used for telephones or cable service. The modem allows users to physically dial into an ISP from any location with a telephone line or, in the case of a cable modem, provides an "always on" connection through the subscriber cable service.

13.   COMPUTER HARDWARE: all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer data. Hardware includes, but is not limited to, any data processing service (such as central processing units (CPU's), self contained "laptop" or "notebook" computers, internal and peripheral storage devices (such as fixed disk, external hard disk, floppy disk drives and diskettes, tape drives and

tapes, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, and video display monitors); and related communications devices (such as modems, cables and connections, recording equipment, and RAM and ROM units); as well as devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

14.    COMPUTER SOFTWARE:  digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form, it commonly includes programs to run operating systems, applications (like work-processing, graphics, or spreadsheets programs), utilities, compliers, interpreters, and communications programs.

15.    ELECTRONIC MAIL or EMAIL:  a system for sending and receiving messages electronically over a computer network, as between personal computers.

16.    UNIFORM RESOURCE LOCATOR (URL):  specifies the location of, and is the address of, a file accessible on the internet.  For example, the URL of the FBI web site is http://fbi.gov.

17.    WEB SITES:  internet sites that all use the techniques and HTML tags to create multimedia documents with hypertext links.  Each web page can contain many screens or printed pages of text, graphics, audio, sound and video. The starting point for any web site is called its home page.

## LOCAL INVESTIGATION

18.    On November 2, 2006, an undercover FBI agent, posing as "Steph", a 41 year-old, single mother of 10 year-old "Sidney", joined a Yahoo! chatroom, in the "Romance- Adult and Fetishes"category .  The particular chatroom entered is a known meeting place for  pedophiles.  Immediately after entering the chat room Steph received an unsolicited contact from Yahoo! account "RON6351" aka: "Ron".

19.    "Ron" initiated the conversation by typing, "nice age…. Mama here. Bama here."  Steph replied "hey how r u."  "Ron" told Steph that he had met online, several months prior, a mother with a 14 year-old daughter.  "Ron" claimed to have had sexual contact with both the mother and the 14 year-old.  Later in the chat, "Ron" told Steph he would "love for us to meet and you and I have a drink and we sit and talk, if you both like and invite me over then you and her can go slip into something sexy."  During the chat, "Ron" emailed a photograph of three adult men that originated from account ron_nelson@bellsouth.net .  "Ron" identified himself as one of the men in the photo.  Before the message reached its final destination of

Steph's e-mail account, the message and photo passed through e-mail account
RON6351@hotmail.com..

20.     On November 3, 2006, Steph was contacted again by "Ron", via computer.
        During this chat session "Ron" detailed to Steph specific sexual fantasies he
        imagined between he, Steph and her child. In particular, "Ron" wrote:

> "I take her little hand and place on my cock. Oh yes, tell
> her to lick head of my cock." In the same chat, Ron asked
> Steph: "think her little pussy needs my tongue on it?
> Licking up and down her sweet slit."

During this chat, Ron suggested that he travel to meet Steph and Sidney for a sexual
encounter. The two talked about possible dates and meeting locations.

21.     During the November 3, 2006 chat, "Ron" telephoned Steph. The 20 minute
        conversation consisted mostly of small talk. It is very common in these types of
        investigations for an individual to place a telephone call to confirm the sex of his
        chat partner.

22.     On November 6, 2006, Steph was contacted by "Ron" via computer. "Ron"
        wrote, "milkshakes at McDonalds huh?"  "Ron" and Steph further refined travel
        plans to Morrow, Georgia. "Ron" requested hotel information from Steph and
        suggested meeting, "on Sunday afternoon."

23.     On November 8, 2006, following a computer chat, "Ron" requested that Steph
        telephone him. He provided a cellular number of 334-324-0944. During the
        telephone conversation and following chat, "Ron" instructed Steph that the two
        should establish a cover story that the purpose of their meeting is strictly for the
        two adults to meet. "Ron" stated that they had to be cautious, and that he would
        lose a lot if it were discovered that he was sexually interested in a child.

24.     On November 2, 2006, a subpoena was issued to Yahoo! regarding
        user account "RON6351". Yahoo! responded on November 16, 2006.
        Account information entered by "RON6351" was recorded as: "Ron Wesson"
        of Montgomery, Alabama, 36117. The user provided an alternate e-mail
        account of RON6351@hotmail.com. internet protocol (IP) logs provided by
        Yahoo! indicate that on November 2nd, 3rd and 6th, during the times of the
        chats between "Ron" and Steph, transmissions associated with Yahoo!
        account "RON6351" emanated from IP address 65.81.128.103.

25.     A November 6, 2006 subpoena response from Bellsouth regarding email
        account ron_nelson@bellsouth.net indicated that the account was
        associated with the residential DSL account of Ron Nelson, 8121 Mossy Oak
        Drive, Montgomery, Alabama, 36117. Bellsouth IP logs indicate that the

photograph and e-mail sent by "Ron" on November 2, 2006 to Steph originated from 8121 Mossy Oak Drive, Montgomery, Alabama. Analysis of Yahoo! and Bellsouth IP logs further indicate that during the chats between "Ron" and Steph on November 2nd, 3rd and 6th, "Ron's" transmissions originated at 8121 Mossy Oak Drive, Montgomery, Alabama, 36117.

26.    A November 8, 2006 subpoena issued to Cingular Wireless regarding the phone number 334-324-0944 informed investigators that the account was registered to Ron Nelson; DOB XX-X8-1948; SSAN XXX-XX-6351 of 8121 Mossy Oak Drive, Montgomery Alabama 36117. Service was established on 04-19-1999 and was current. Cingular records indicated a contact email account of: ron_nelson@bellsouth.net and an alternate phone number of 334-270-1772.

27.    A public records search of telephone number 334-270-1772 indicates an association with Ron and Onie Nelson, 8121 Mossy Oak Drive, Montgomery, Alabama, 36117. Recent credit reports indicate that Ron and Onie Nelson currently reside at that address.

28.    A visual comparison between the photograph e-mailed by "Ron" on November 2, 2006 to Steph, and the photograph of Ronald Nelson, DOB XX-X8-1948 of 8121 Mossy Oak Drive, Montgomery Alabama on file with the Alabama department of motor vehicles suggests that they are one in the same.

29.    On November 13, 2006 investigators observed a 2004 Jeep Wrangler parked in the driveway of 8121 Mossy Oak Drive, Montgomery Alabama 36117, bearing Alabama license plate 3A1760V. This vehicle is registered to Ronald A. Nelson, 8121 Mossy Oaks Drive, Montgomery, Alabama, 36117, Alabama Drivers License Number XXX5022.

30.    On November 16, 2006, investigators observed a red 2005 Ford Escape XL parked in the drive way of 8121 Mossy Oaks Drive, Montgomery, Alabama, 36117, bearing Alabama license plate 3A9840P. This vehicle is registered to Wheels LTS Lessor, in Montgomery County, Alabama with an address of 8121 Mossy Oaks Drive, Montgomery, Alabama, 36117. Records indicate Ronald A. Nelson is associated with this vehicle.

31.    On November 17, 2006, investigators confirmed that Ronald A. Nelson confirmed a reservation for the Hampton Inn, 1533 South Lake Parkway, Morrow, Clayton County, Georgia, for Sunday, November 19, 2006.

PURSUANT TO MY TRAINING AND EXPERIENCE, I KNOW THE FOLLOWING:

32.    The majority of individuals who collect child pornography and subscribe to child pornography websites have a sexual attraction to children. They receive sexual

gratification and satisfaction from sexual fantasies fueled by depiction children that are sexual in nature.

33.    Individuals whose sexual objects are minors commonly collect and save child pornography as representations of their sexual fantasies. These include explicit reproductions of a child's image, voice, or handwriting, computer images files, photographs, negatives, magazines, motion pictures, video tapes, books, slides, audiotapes, handwritten notes, drawings or other visual media.

34.    Individuals who collect child pornography usually keep and cherish it and they rarely throw it away. Collectors typically keep it for many years, and will not be without it for long periods of time. These materials are usually maintained in a secure place, most often a residence, to avoid detection by law enforcement.

35.    Child pornography is a permanent record of the sexual abuse of child victims. Each time child pornography is reproduced, downloaded, or forwarded by an internet user, the victimization of the minor appearing in the pornography is perpetuated. Such items are important evidence and indications of an individual whose sexual objects are children and that individual's motive, intent, and predisposition to violate Section 13A-12-192 of the Code of Alabama and Title 18 of the United States Code, 2251(a)(b)(c)(A).

36.    Individuals who collect child pornography often correspond or meet others to share information and material, rarely destroy correspondence from other child pornographers, conceal such correspondence as they do their sexually explicit material and often maintain lists of names, addresses, telephone numbers and screen names of individuals with whom they have been in contact and who share the same interest in child pornography.

37.    The majority of individuals who collect child pornography maintain books, magazines, newspapers and other writing, in hard copy or digital medium on the subject of sexual activities with children, as a way of understanding their own feelings toward children, justifying those feelings and finding comfort in the fact that they are not alone in their illicit desires and behaviors focused on children. Such individuals rarely destroy these materials because they play an integral role in their fantasy lives and provide them with psychological support.

38.    Computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime; and/or, (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime. In this case, the warrant application requests permission to search and seize images, including those that

may be stored on a computer. These images constitute both evidence and instrumentalities of crime. The warrant application also requests permission to search and seize records of correspondence, including those that may be stored on a computer. This affidavit also requests permission to seize the computer hardware that may contain the images and correspondence if it becomes necessary for reasons of practicality to remove the hardware and conduct a search off-site. Your affiant believes that, in this case, the computer hardware is a container for evidence, and also, itself, an instrumentality of the crime under investigation

39.    Searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

a.    The volume of evidence. Computer storage devices (like hard disks, diskettes, tapes, laser disks) can store the equivalent of millions of information. Additionally, a suspect may try to conceal criminal evidence, i.e, he might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

b.    Technical Requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

c.    Data Recovery. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

d.    Data Recovery. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less

on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

e.    Data Analysis Techniques. Searching the subject computer system for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, it is possible for agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. For example, agents may be able to execute a "keyword" search that searches through the files stored in a computer for special words that are likely to appear only in the materials covered by a warrant. Similarly, agents may be able to locate the materials covered in the warrant by looking for particular directory or file names. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information. These steps may require agents to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant.

40.    In light of these concerns, I hereby request the Court's permission to seize the computer hardware (and associated peripherals, to include any and all data storage devices and media) that are believed to contain some or all of the evidence and/or instrumentalities described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

41.    Based on the foregoing, I also request permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in the exhibits hereto.

CONCLUSION

42.    Based upon the above, I believe probable cause exists to establish that
       evidence exists, as described in detail in Attachment A, of a violation of Title 18
       USC 2422(b), Title18 USC 2252 and Title18 USC 2252A at 8121 Mossy Oak
       Drive, Montgomery Alabama 36117.

                                         Margaret L. Faulkner, Affiant
                                         Special Agent, FBI


Sworn and subscribed
Before me this _____ day of
November, 2006


Delores R. Boyd
United States Magistrate Judge

## ATTACHMENT "A"
## PROPERTY TO BE SEIZED

1.  Tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, CD-ROMs, CD-RWs, CD-Rs, DVDs, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners in addition to computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, or other visual depictions of such Graphic Interchange format equipment that may be or are used to depict child pornography, child erotica, information pertaining to the sexual interest in child pornography, sexual activity with children or the distribution, possession or receipt of child pornography, child erotica or information pertaining to an interest in child pornography and the data within the aforesaid objects relating to said materials.

2.  Correspondence pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexually explicit conduct.

3.  Visual depictions of minors engaged in sexually explicit conduct in whatever form, including, but not limited to books, magazines, photographs, negatives, films or videocassettes containing such images.

4.  Envelopes, letters and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages that:

    a.  Offer to transmit through interstate or foreign commerce, including by United States mail or by computer, visual depictions of minors engaged in sexually explicit conduct;
    b.  Solicit minors to engage in sexually explicit conduct for the purposes of producing child pornography;
    c.  Identify persons transmitting any visual depiction of minors engaged in sexually explicit conduct.

5.  Books, ledgers and records bearing on the production, reproduction, receipt, shipment, orders requests, trades, purchases or transactions of any kind involving the transmission of any visual depiction of minors engaged in sexually explicit conduct.

6.  Address books, mailing lists, supplier lists, mailing address labels and any and all documents and records pertaining to the preparation, purchase and acquisition of names or lists of names to be used in connection with the

purchase, sale, trade or transmission of any visual depiction of minors engaged in sexually explicit conduct.

7.    Address books, names, lists of names and addresses of minors visually depicted while engaged in sexually explicit conduct.

8.    Diaries, notebooks, notes and other records reflecting personal contact and other activities with minors visually depicted while engaged in sexually explicit conduct.

9.    Materials and photographs depicting sexual conduct between adults and minors.

10.    Records evidencing occupancy or ownership of the premises known and described as including, but not limited to, utility and telephone bills, mail envelopes or addressed correspondence.

11.    Records or other items which evidence ownership or use of computer equipment found in the above residence, including, but not limited to, sales receipts, bills for Internet access, handwritten notes and handwritten notes in computer manuals.

12.    Any and all records, documents, invoices and materials that concern any Internet accounts.

13.    Any of the items described in paragraphs 1-12 above that are stored in the form of magnetic or electronic coding on computer media, or media capable of being read by a computer, with the aid of computer related equipment, including floppy diskettes, CD-ROMs, CD-Rs, CD-RWs, DVDs, fixed hard drives or removable hard disk cartridges, software or memory in any form. The search procedure for electronic data contained in computer operating software or memory devices, where performed onsite or in a laboratory, or other controlled environment, may include the following techniques:

    a.    The seizure of any computer or computer related equipment or data, including floppy diskettes, CD-ROMs, CD-Rs, CD-RWs, DVDs, fixed hard drives or removable hard disk cartridges, software or memory in any form containing material described above, and the removal thereof from the PREMISES for analysis by authorized personnel;

    b.    Surveying various file "directories" and the individual files they contain (analogous to looking that the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

    c.    "Opening" or cursorily reading the first few pages of such files in order to determine their precise contents;

    d.    "Scanning" storage areas to discover and possibly recover recently deleted data;

e. Scanning storage areas for deliberately hidden files; or

f. Performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.  Keywords include words relating to pornography, sex, genitalia, intercourse and topics relating to teen and pre-teen activities.